Loomer v. Wheelwright.

## LOOMER *v*. WHEELWRIGHT.

AN original bill may be filed to set aside a decree obtained by fraud.

Where a mortgagee, having two mortgages for the same debt, one on the principal debtor's lands, and one on lands of a surety whose infant heir has succeeded thereto, after the debt was satisfied by a conveyance of the former, filed a bill against the infant to foreclose the mortgage on the lands of the latter, in which he claimed the mortgage money to be due, and the infant answered by his guardian ad litem, no defence was set up, the usual decree for a foreclosure and sale was made, and the infant's lands were sold under the decree, the mortgagee becoming the purchaser of a portion of the same; it was *held* that the decree was obtained by fraud, and it was set aside.

Also held, that the mortgagee must release to the infant the lands bought in by him, and account for the rents and profits of the same, and for the sums paid by the purchasers at the sale, who were strangers to the fraud.

A husband and wife joined in executing two mortgages, accompanying his two bonds; all being given for the same debt. This was in part a pre-existing debt of the husband's, and in part money advanced to him at the time. One mortgage was on his own lands, the other was on the wife's inheritance. *Held*, 1. That the husband's lands were the primary fund for the payment of the mortgages, and the wife's became the secondary or auxiliary fund for that purpose. She became the surety for her husband in respect of the latter. 2. That the suretyship is made out in such a case, by showing that it was the husband's debt, or that he received the money advanced. If the money were used for the benefit of the wife or her property, or any circumstance exist which will defeat her claim to be regarded as a surety; it must be proved by the party alleging such fact.

A second mortgagee, holding also the mortgage liability of a surety, bought of the mortgagor, the premises mortgaged, for a price exceeding the first lien and his own combined, and received an absolute deed, subject to the first lien. The excess beyond the first lien, was not applied to the debt secured by the second mortgage; but shortly after the sale, the purchaser agreed in writing with the

principal to apply the net profits beyond the price paid, to that mortgage debt. *Held*, as between him and the surety, 1. That his mortgage was merged by receiving the conveyance in fee, and that his debt was extinguished. 2. That if it were otherwise, he must account to the surety for the price paid beyond the amount of the first lien; and this being more than the debt, the surety was discharged. 3. That as between the principal debtor and the mortgagee, the latter could still enforce the debt.

Although in the absence of direct proof of intention, equity will intend a merger or the contrary, from the interest of the party taking the deed being in one direction or the other; it cannot prevent a merger contrary to his interest, where he clearly intended to do the acts which legally effect a merger, although he may have done them under an erroneous view of their legal consequences. Where two persons are joint mortgagees, but are each owners in severalty of a part of the mortgage debt; one of them may so act as to merge his own mortgage interest, without affecting that of the other.

Where such a joint mortgagee pays to his co-mortgagee a portion of the debt of the latter, with the express purpose of discharging his lien; the former cannot enforce the mortgage for such payment, or be subrogated in respect thereof.

A surety who gives a separate mortgage, on conveying a part of his lands in satisfaction of the debt, is entitled to be subrogated to the mortgagee's claim on the mortgage of the principal debtor.

May 13, 14, 15; December 22, 1845.

THE bill in this cause, filed January 16th, 1844, by Charles W. Loomer, an infant aged sixteen years, who prosecuted by William T. Whittemore, his next friend, set forth the following facts:

On the 1st day of May, 1837, Otis Loomer and Jane T. his wife, the father and mother of the complainant, executed to Paul Spofford, Thomas Tileston, and Benjamin F. Wheelwright, the defendant, as collateral security for Otis Loomer's bond of the same date for $25,000, payable in one year with interest, a mortgage on six stores and lots in the city of New York, known as numbers 187 and 189 Pearl street, and 1, 3, 5 and 7 Cedar street. On the same day, Loomer and his wife, to secure Loomer's bond, conditioned to pay $40,000 in one year with interest, executed to the same three persons, a mortgage on property therein described, as " all the undivided tenth part of all the lands, tenements, hereditaments, and real estate of which Samuel Whittemore died seised or possessed of unto; the said tenth part being the said Jane T. Loomer's share of the estate of the said Samuel Whittemore, as one of his heirs at law."

Both of these mortgages were recorded on the 3d day of May, 1837.    When the last described mortgage was executed, the defendant knew that the lands thereby mortgaged, were the individual property of Mrs. Loomer.   The two bonds and mortgages were executed at the same time, and were given to the mortgagees jointly, so that neither might have priority ; but they were intended to secure two wholly distinct demands, the one to Spofford and Tileston jointly, in which Wheelwright had no interest, the other to Wheelwright solely and exclusively.   The sums named in the bonds and mortgages were nominal, both set of securities being in fact given to secure the same sums then owing by Otis Loomer to Wheelwright and to Spofford and Tileston, respectively, and a loan of $3000 then made to him, one-half by S. and T., and the other half by Wheelwright ; and on a verbal agreement, that the mortgages should be security for future advances to be made by them to Loomer.   The bill charges that this agreement was not binding on the complainant.   When the bonds and mortgages were given, the amount due from Loomer to Spofford and Tileston, including the $1500 then advanced, did not exceed $12,000 ; and the amount due to Wheelwright, including the $1500 advanced, was $8217 41 ; all of which, except the $1500, was for cash and notes advanced to Loomer by Wheelwright previous to the execution of the mortgages, and W. made no advances upon the mortgages after the time of their execution.

In August, 1835, a bill was filed in this court before the Chancellor, by two of the heirs of Samuel Whittemore, against his widow, Jane H. Whittemore, Otis Loomer, and Jane T., his wife, and the other heirs of Samuel Whittemore, for the partition of the real estate of the latter.   On the 5th of November, 1837, an interlocutory decree was made in that suit, settling the rights and interests of the parties, and appointing commissioners to make the partition, with the usual directions in such cases.   The dower of Mrs. Whittemore was to be set off in each of the heir's allotments, in equal proportions.

On the 16th day of December, 1837, after the commissioners had made the allotments, but before they reported the same, Mrs. Loomer died, leaving the complainant her only child and heir.

A bill of revivor and supplement was filed, and on the 30th of January, 1838, a decretal order was made, reviving the partition suit against the complainant, and declaring his rights and interests in the lands, &c. The commissioners allotted to the complainant for his tenth part of Samuel Whittemore's lands and tenements, one lot in Barrow street, and one lot in Sixth Avenue, in which Mrs. Whittemore was to have a life estate as her dower; together with four lots on Fourth; and on Bleecker, Christopher, Factory, Twenty-fifth and Twenty-Sixth streets, one lot each; all of the last mentioned lots, being subject to Loomer's life estate as tenant by the curtesy.

Some time in 1838, Spofford, Tileston and Wheelwright, released from the effect of their mortgage, two of the lots on Fourth street to a purchaser thereof, upon receiving $4,600, of which Wheelwright retained one-half, and S. and T. the residue.

In February, 1839, Loomer as the special guardian of the complainant, pursuant to an order of this court, conveyed to Spofford and Tileston, another of the Fourth street lots, and the lot on Bleecker street, in full satisfaction and discharge of their interest in the two bonds and mortgages; and Wheelwright at the same time released those two lots from his lien by virtue of the mortgage thereon.

On the 25th of November, 1841, Wheelwright filed his bill in this court, for the foreclosure of that mortgage, against all the lots set off to the complainant in the partition, except those which had been released. The defendants in the bill, were the now complainant, Otis Loomer, Spofford and Tileston, and Frederic De Peyster, administrator, &c., of John Clendinning. Wheelwright thereby claimed that there was due to him on the mortgage, the sum of $7010 64, with interest from November 1st, 1841; although nothing whatever was then due to him thereon, and on the contrary, he had been overpaid a large sum.

A guardian *ad litem* in that suit was appointed for the now complainant, who put in the usual general answer, and on the 10th day of February, 1842, a decree was made directing a foreclosure and a sale of all the lands of Mrs. Loomer remaining subject to the mortgage, except one lot mortgaged to Mr. De Peyster. On the reference, the master reported due to Wheelwright, $7209

31, which sum, with interest and costs, was to be paid to him out of the proceeds of the sale. Mr. De Peyster had put in an answer, claiming a prior lien by way of mortgage on the lot excepted in the decree, and it was provided that he and Wheelwright should be at liberty to litigate as to their priorities in respect of that lot, notwithstanding the decree.

On the 28th of March, 1841, the lots embraced in the decree were sold by a master. Wheelwright. became the purchaser of the lot on Barrow street, for $1140, and the lot on Christopher street for $525. The lots on Factory, Twenty-fifth and Twenty-sixth streets, were sold to strangers for the aggregate sum of $1220. The net amount of the sales, after discharging prior liens was $2784 10; out of which were deducted the master's costs, with Wheelwright's and the guardian's being together $303 27; the master paid Wheelwright $815 83; and he receipted $1665, more for his own purchases. The decree was enrolled April 25, 1842; the lots sold were conveyed to the respective purchasers by the master; and his report of sale was duly confirmed in July, 1842. The deficiency on Otis Loomer's bond as reported by the master, was $4729 16.

On the 18th of November, 1842, Mr. De Peyster as administrator of Clendinning, filed his bill in this court in the nature of a cross bill against Wheelwright, setting up a mortgage executed to him by the complainant's special guardian pursuant to an order of the court, on the Sixth Avenue lot, subsequent in date to the mortgage on Mrs. Loomer's lands before set forth; and charging that both of the Loomer mortgages were given to secure the same debt, that the one on the Pearl and Cedar street lots was still outstanding; and praying that Wheelwright might be compelled to exhaust those lots before proceeding against the Sixth Avenue lot, which was De Peyster's only security.

Wheelwright answered De Peyster's bill, on his oath in January, 1843. By that answer, and by the records in the office of the register of deeds, it appeared that Loomer on the 1st day of February, 1840, in consideration of $48,350, as expressed in the deed, conveyed lots 187 and 189 Pearl street, to Wheelwright in fee; and in consideration of $16,000, as expressed in the deed, conveyed to W. in fee, lot No. 1 Cedar street, By the

deeds, these three lots were sold subject to a mortgage for $60,000, executed by Loomer to John Jacob Astor. That on the 6th of February, 1840, Loomer by another deed, in consideration of $52,000, as therein expressed, conveyed in fee to Wheelwright, lots No. 3, 5 and 7 Cedar street; each lot being so conveyed, subject to a mortgage thereon executed by Loomer to the estate of Laurent Salles for $16,000, amounting in all to $48,000. That these several deeds were recorded February 7th, 1840.

The present complainant in his bill, further stated that the lands conveyed by those deeds were the individual property of Otis Loomer, when the mortgage herein first mentioned was given thereon by him, and Wheelwright then knew it. The deeds were absolute, and were as such accepted and received by Wheelwright; and by reason of those conveyances, the mortgage on the Pearl and Cedar street lots merged in the estate in fee, and was no longer a valid and subsisting lien on those lots; and that Wheelwright expressly admits the same in and by his answer to the bill filed by De Peyster. That the whole consideration mentioned in the deeds of those lots, and which in the same answer Wheelwright admits he agreed to pay therefor to Loomer, was $116,350. That the whole amount of the prior mortgages subject to which the same were conveyed, was $108,000; leaving a balance of $8350, which Wheelwright was bound to credit to the now complainant, in full satisfaction of the mortgage given on his mother's inheritance; but no part of that sum was ever credited on either of the two mortgages executed by Loomer and wife to Spofford, Tileston and Wheelwright.

At the time the deeds of the Pearl and Cedar street lots were executed, the amount due to Wheelwright who was then alone interested in those two mortgages, did not exceed $6500.

On the 16th of January, 1840, the three mortgagees released to a purchaser, the only Fourth street lot not herein otherwise accounted for, on which Wheelwright received $500, no part of which sum was credited by him.

The bill charged that the obtaining the before mentioned decree for foreclosure by Wheelwright in his suit on the mortgage upon Mrs. Loomer's lands, was fraudulent, and tended to and did deprive the complainant of his estate in those lands. It further

stated that on receiving the master's deed, Wheelwright entered and continued in possession of the Barrow and Christopher street lots. The bill prayed that the foreclosure decree might be set aside as fraudulent and void as between the complainant and Wheelwright; that W. might be decreed to convey to the former, the two lots last mentioned, and to account for the rents and profits; also to pay the amount received by the master on the sales to strangers under the decree, with interest, and the amount which he had been overpaid when he filed his foreclosure bill.

The answer of Wheelwright admitted all the statements in the bill, except as is otherwise noted. He alleged that Loomer had an estate as tenant by the curtesy in his wife's lands, which he mortgaged to Spofford, Tileston and Wheelwright; and after the partition, the lien continued on that interest. He stated that when Spofford and Tileston's debt secured in the two mortgages, was paid off in February, 1839, the lots conveyed to them were taken at an appraised value which fell $675, short of the amount due to them; and he paid that sum to them, which he claimed continued a lien in his favor on the mortgage of Mrs. Loomer's land. He also claimed it by way of subrogation to Spofford and Tileston's lien, or as a further advance. The sum which he alleged to be due in his foreclosure bill and for which he obtained the report of the master, included this $675, as being advanced on the 28th of October, 1841. Owing to a difficulty in the title, the deed to Spofford and Tileston was not accepted by them till that day, and then he released the lots conveyed to them. He insisted that the whole sum claimed on his foreclosure, was then actually due to him. That the lot on Christopher street bought by him at the master's sale, was sold subject to a prior lien thereon for $1337; and the lot on Barrow street was subject to an annual payment of $400, to Mrs. Whittemore, as arranged in the partition, for her dower interest in the lands descended to Mrs. Loomer. The lot on Factory street sold by the master, was subject to a prior lien for $1500.

He denied that the conveyances of the Pearl and Cedar street lots, were executed and accepted with the design or intent to merge Loomer's mortgage to him, S. and T. thereon, so as to cancel the debt so far as the complainant is concerned, and render the mort-

gage on Mrs. Loomer's lands no longer a lien on the same; or under such circumstances as would operate to effect such merger, or destroy the lien of the latter.

That although the consideration expressed in those deeds was $116,350, he never admitted that he agreed to pay that amount, and it was expressly provided in the agreement made at the time, that he should not assume, or be liable for the mortgages to Astor, and the estate of Salles. At that time, and until October 28, 1841, Spofford and Tileston's interest continued in Loomer's mortgages.

He alleged that the $500 received on releasing the Fourth street lot, was held by him subject to an undetermined condition with the purchaser, and that in no event could the now complainant become entitled to its benefit, because the latter's share in the partition was liable to such purchaser for the value of the lot so released, for equality of partition.

He denied that his foreclosure decree was obtained by fraud, or tended to or did injure the complainant, or deprive him of any rights. He averred that he had a full and perfect right to foreclose the mortgage and obtain such decree as he did; the decree was justly obtained, and it should be held as binding and conclusive upon the complainant. As to the possession of the two lots purchased by him under the foreclosure, he never entered on the Barrow street lot, the rents being taken for Mrs. Whittemore's dower right. He had occupied the Christopher street lot from January 1st, 1842. He alleged that the Pearl and Cedar street lots were conveyed to him at Loomer's request, so that he might manage them for his better security, Loomer being insolvent and about to leave the country, and if the title remained in him it would be affected by judgments, &c. That Wheelwright did not pay any money to Loomer personally on receiving the deeds, considering the lots to be then incumbered for more than they were worth on a forced sale at that time. The consideration in the deeds was the supposed amount of all the incumbrances thereon. A conditional engagement was given in pursuance of the agreement between Wheelwright and Loomer, in these words :

"NEW YORK, 6th February, 1840.—Whereas I have this day

purchased of Otis Loomer two stores in Pearl street, and four in Cedar street, as per deeds, for the sum of one hundred and sixteen thousand, three hundred and fifty dollars ; and as a further consideration, I have agreed, and do hereby agree, to apply all profits gained by me in said purchase, over and above interest, taxes, assessments, repairs and improvements on said estate, to the extinction of a claim I now hold against him of about six thousand dollars, which is secured to me by a mortgage, dated May 1st, 1837, made by O. Loomer and wife, to P. Spofford and Thomas Tileston, and myself, on one undivided tenth part of the real estate of Samuel Whittemore, deceased. But it is understood and agreed, that I relinquish no right to collect the said claim of six thousand dollars from the property so mortgaged, in the same manner as I could have done had this agreement not have been made, as it is not expected by me that there will ever be any profits on this purchase, over seven per cent. interest, and other necessary charges, as mentioned above. And it is also agreed that I do not assume the payment of any of said Loomer's bonds, but the holders are to look to the estate, and said Loomer only, for payment, without any recourse to me.

B. F. WHEELWRIGHT."

The mortgages given by Loomer and wife on the first of May, 1837, formed no part of the consideration of the deeds of the Pearl and Cedar street lots, and no part or portion of the mortgages was deducted from or allowed on the purchase money. A memorandum showing a true account of the purchase, the moneys paid, and the deductions for liens, was made at the time, of which the following is a copy :

" Memorandum of settlement with Otis Loomer, for purchase of stores in Cedar and Pearl streets, in the city of New York.

| | | |
|---|---:|---:|
| Store 187 Pearl street, purchased for | $24,350 | 00 |
| "    189    "         "      " | 24,000 | 00 |
| "    1 Cedar street,    "      " | 16,000 | 00 |
| | $64,350 | 00 |
| Deduct Astor mortgage on the whole, | 60,000 | 00 |
| | $4,350 | 00 |

Loomer v. Wheelwright.

|  |  |  |
|---|---|---|
| Amount brought over, |  | $4,350 00 |
| Store, 3 Cedar street, purchased for | $17,000 00 |  |
| Deduct Salles mortgage    " | 16,000 00 | 1,000 00 |
| Store, 5 Cedar street, purchased for | $17,500 00 |  |
| Deduct Salles mortgage    " | 16,000 00 | 1,500 00 |
| Store, 7 Cedar street, purchased for | $17,500 00 |  |
| Deduct Salles mortgage    " | 16,000 00 | 1,500 00 |
| Total, |  | $8,350 00 |
| Deduct Whittemore mortgage on all the above, for | $6,000 00 |  |
| Deduct taxes then due, | 514 45 |  |
| "    my note, payable in six months, | 1,850 00 | 8,364 45 |
| Balance due me which was paid by O. Loomer, |  | $14 45" |

The note of $1850 was indorsed by Loomer and then cashed, and of the proceeds, $1680 were paid for interest then due on the prior mortgages, and only about $5 was left for Loomer. That $514 45 was paid by Wheelwright for taxes then due on the stores and lots. That these facts substantially, were set forth in his answer to De Peyster's bill, except that he omitted to state the application of the note for $1850. That he has kept an accurate account of his receipts and expenses, in respect of those stores and lots, with a view to the application of the surplus profits pursuant to his agreement.

On the 1st of September, 1841, he lent to Loomer $600, to enable him to purchase a farm at Westfield, New Jersey, on which to reside with his son, as security for which, L. surrendered the above agreement. This sum has never been repaid. On the 15th of December, 1842, for a final settlement of the agreement, and in full thereof, W. paid to L., in addition to the $600 lent, ten shares of rail road stock of the par value of $1000, and then worth $860. Loomer was then insolvent, and unable to provide for his own and the complainant's support; the latter living with and depending upon his father; and the

Loomer v. Wheelwright.

allowance was believed to be a full equivalent for the surplus profits reserved in the agreement before set forth. The deed for the farm was taken in Wheelwright's name to secure it for the complainant, and W. recently conveyed it to Loomer in trust for the complainant, and L. has since conveyed it to the next friend of the complainant, on the same trust. In February, 1843, W. let Loomer have $250 for his own and his son's support, on a pledge of the rail road stock ; and recently, W. paid $762 82 on the same stock to the complainant's next friend, and took from him a bond conditioned for its application for the benefit of the complainant.

The answer claimed that these several sums should be allowed to Wheelwright, in any account decreed to be made between him and the complainant. It insisted that the statement of a merger, in his answer to De Peyster's bill, was a legal inference, by which he is not bound as to the complainant, against whom neither of the Loomer mortgages, ought under the circumstances, to be deemed cancelled. That since buying the Pearl and Cedar street lots, he has ascertained other liens thereon to more than $6800, including $2730 arrears of interest on the Astor and Salles mortgages ; and Loomer had collected $1250 of the rents in advance. Since then, No. 7 Cedar street has been sold for $15,000, on a foreclosure of the Salles mortgage thereon.

The answer further insisted that if Wheelwright were to account, he should be allowed the $1393 65, paid to Astor on the Christopher street lot, and the $675, paid to Spofford and Tileston, as well as the $1612, paid for the Jersey farm.

The testimony on the part of the defendant, proved the payment of the $675, to Spofford and Tileston on the 28th of October, 1841, and that such payment was a condition upon which they discharged their part of the mortgages. Also the payment to Astor on the prior mortgage, subject to which the Christopher street lot was allotted in the partition. Also the application of Wheelwright's note of $1850, and the payment of $514 45, for taxes, as stated in the answer ; that the $500 received by W. on the Fourth street lot, was due to and held for the purchaser, on the ground of a claim by him against the complainant for equality of partition, pursuant to some re-appraisement made between

the Whittemore heirs subsequent to the decree in partition. Also the purchase of the New Jersey farm for the complainant and his father, and their residence on it three or four years, and its conveyance to the guardian *ad litem*, in trust, but subject to the event of this suit. W. T. Whittemore testified that Wheelwright purchased for $1000, his mortgage for $6000, on the Pearl and Cedar street lots; and it was doubtful in February, 1840, whether those lots on a foreclosure, would have brought more than the first mortgages thereon.

Otis Loomer, examined for the defendant, testified that the deeds of those lots were intended to be absolute, and the consideration was as therein expressed. There was no promise or condition, but he trusted to Mr. Wheelwright's honor. A few days after the conveyances were made, Mr. W. sent to him the agreement dated February 6, 1840. He, Loomer, expected that the property would pay all he owed, and that W. would pay the mortgages given to Spofford, Tileston and Wheelwright, out of any thing over and above the first liens, interest, taxes, &c.

*Murray Hoffman*, for the complainant, presented and argued the following points:

1st. By the operation of the several mortgages executed by Otis Loomer, one upon the wife's inherited estate, and the other upon the individual property of Loomer, the relation of principal and surety was established. And the property of the husband, contained in one of the mortgages, became the primary fund for the payment of the husband's debt, and the property of the wife comprised in the other mortgage, became the secondary or auxiliary fund. (13 Conn. R. 376; Pitman on Princ. and Surety, in 8 Law Library, N. S. 119, 160, 166.)

2d. The case is thus brought within the decision and principle of *Gahn* v. *Neimcewicz*, and similar authorities, (3 Paige, 614; 11 Wend. 312.) Also (Beatty's R. 386; *Graves* v. *Graves*, 1 Wash. C. C. R. 1; *Eddy* v. *Traver*, 6 Paige, 521.)

3d. The effect of the deeds of February, 1840, even coupled with the agreement delivered some days after the delivery of such deed, was to charge the defendant Wheelwright, with the sum of $8350, the agreed value of the equity of redemption, in the hus-

band's mortgaged property, and to fully and finally discharge the premises inherited by the wife and comprised in the collateral mortgage in which she joined. (*James* v. *Morey*, 2 Cowen, 248; *Denniston* v. *Burnham*, 5 J. C. R. 35; *Sealey* v. *Lake*, 1 Beav. 146; *Hood* v. *Phillips*, 3 Beavan, 514; *Astley* v. *Mills*, 1 Simons, 298.)

4th. When Wheelwright filed his bill to foreclose the mortgage upon the wife's property, he had been actually overpaid, by the sum of at least $1334.

5th. The relief sought as to the Christopher street lot, on which an apportionment of a mortgage executed by Samuel Whittemore, the ancestor was made to the amount of $1337, is a re-conveyance to the infant of the same, and upon the payment, or security to him of such sum of $1337, or such sum as may have been paid upon the same.

6th. The defendant assumed the payment of the arrears of interest on the mortgages, as well as the principal, or has been fully repaid by the rents of the premises.

7th. The amount if any due on the Boardman mortgage, forms no demand in favor of defendant.

In answer to the defendant's points, as to the decree in his foreclosure suit being a bar, and not to be assailed by an original bill; Mr Hoffman cited *Richmond* v. *Tailleur*, 1 P. Will. 737; *Monell* v. *Lawrence*, (12 Johns.§ 525;) *Bradish* v. *Gee*, (Ambler, 229;) *Stiles* v. *Martin*, (1 Ch. Ca. 150;) (Mitford's Pl. 93, 94, and cases cited; Story's Eq. Pl. 340, § 427; 1 Hoff. Ch. Pr. 233;) *Savage* v. *Carroll*, (1 Ball & Beatty's R. 548; 1 Hoff. Ch. R. 178.)

*A. W. Bradford*, and *John Anthon*, for the defendant.

I. The complainant having duly appeared to the bill filed by defendant, for foreclosure, in 1841, and having then full power to raise as a defence, his present assumption of a merger in law, and having failed to do so, and the decree being enrolled; it is properly interposed as a bar by the answer, and is a flat bar to complainant's bill in the absence of fraud. (Beames Pleas, 211, 217; Mitford, 84, 92, 236; Cooper, 89; 3 J. C. R. 367; 3 Atkyns, 626;

2 P. Will. 819; 3 Ves. 317; 1 Ves. & B. 233; 1 Sch. & Lef. 317, 387.)

II. There is no proper special averment in the bill of complaint of any fraudulent conduct on the part of the complainant in obtaining that decree, nor is there, if averred, any proof of fraud. The matters of error in law alleged to have occurred, are the subject of a bill of review only.

III. The proceedings in the case of *De Peyster* v. *Wheelwright*, and the decree in that suit, are *res inter alios acta*, and the complainant in this suit cannot avail himself of them, nor is the defendant in any wise affected by them, the decree having been appealed from. The facts relied upon may be used on a bill of review and not otherwise.

IV. A decree so appealed from, could not be pleaded in bar, pending the appeal, by the party himself, in whose favor it was rendered; *a fortiori* it cannot be used as a weapon of offence by a stranger.

V. Admissions made in that suit, are necessarily too, confined to the suit and the parties; these parties have nothing to do with them under any form of bill.

VI. The present bill therefore, must invoke other grounds of support, and there are none.

First, The supposed merger affords no ground of support.

1. Because it does not exist in point of fact, or law, the instruments of conveyance, being clearly proved to have been mortgages, by reason of the defeasance.

2. The hypothecation of the instrument of defeasance to secure the advance, made to Loomer afterwards, did not change the character of the original transaction.

3. If a merger, the complainant was bound to have availed himself of it in proper season, before decree, the facts at that time existing and the recording of the deeds being notice to him.

4. There is no averment, or proof of any difficulty in discovering the fact, if due diligence had been used; even a bill of review would therefore be untenable.

5. There is no averment or proof of any fraudulent concealment which can affect the decree.

Second. The admission of the pleader, in drawing the answer, in

Loomer v. Wheelwright.

a case between other parties and in setting forth a matter of mere law, affords no support to this bill, which prays that a decree may be vacated on the ground of fraud, and which uses such mistakes in opposition to all sound rules of evidence, as proof of fraud.

It is presumed that these positions are sufficient to show that the present bill of complaint is entirely untenable, and must be dismissed with costs. But if the details are deemed by the court, still matters open to investigation here, then we insist on the following points in further special detail.

A. A mere inference of law where all the facts have been stated, should not operate to the prejudice of a party in a suit; much less should an error of law in one suit, prejudice him in another, between different parties. The points of law therefore, raised in the case wherein Depeyster was complainant, and Wheelwright defendant, should not be allowed to estop the defendant in this case from claiming his rights.

B. The acceptance of the conveyance of the Pearl and Cedar street lots, did not operate to merge the mortgage thereon in the estate in fee, or to cancel the mortgage.

1. Because Spofford and Tileston were still interested in the mortgage.

2. Because the mortgages of Wm. T. Whittemore, and of Wm. Boardman were intermediate.

3. Because a merger will not be presumed in the absence of any expressed intention, and against the interest of the party. (2 Fonbl: Eq. 163; Theobald Princ. and Surety, 95, 96; *James* v. *Morey*, 2 Cowen, 247, 303, 307, 309; 7 Paige, 510; 1 Hill, 170; 1 Paige, 193; 1 Madd. Pr. 540; *Dunham* v. *Dey*, 2 J. C. R. 189.)

C. Although the defendant took absolute deeds of the Pearl and Cedar street lots, he did so on a trust intended for the benefit of the infant's estate, which was an equitable trust, and should be sustained. (2 J. C. R. 189; *Van Buren* v. *Olmsted*, 1 Paige, 9; *Brown* v. *Dean*, 3 Wend. 208.)

D. If the infant is to be considered as a surety for the debt of his father, there has been no such dealing with the principal as will absolve the surety.

1. Because no extension of time was given.

2. Because the acceptance of the deeds enured to the benefit of the infant.

3. Because the very gist of the arrangement indicated that the mortgages were considered as still in existence ; and that provision was to be made, by the arrangement, for the liquidation of the lien on the infant's estate. (3 Paige, 614 ; 8 ibid. 277 ; 4 Wend. 381 ; Theob. on Pr. and Surety, 95, 96, and 84, 86 ; 2 Sim. & St. 457.)

E. The fact that the title was not searched, and that all the payments made at the time of taking the deeds, were made on prior liens and merely to protect the property, shows that no purchase intended to operate as a merger, was contemplated.

F. The evidence of Otis Loomer shows that the trust has continued to this time ; the surrender of the instrument of trust which occurred after the decree and sale in foreclosure, even if valid cannot be permitted to have a retro-active effect.

G. The mortgages were made at open amounts. They have been reduced by parol testimony ; and it is further competent to show by parol, that they were intended to secure future advances.

H. The payment by the defendant to Spofford and Tileston, of $675, the balance of their claim on October 28, 1841, shows that the parties believed the mortgages were not cancelled ; and also constitutes such a future advance as would alone justify the proceedings in foreclosure. (2 Cowen, 292 ; *United States* v. *Hooe*, 3 Cranch.)

I. All the accompanying circumstances show that the real character of the transaction of 6th February, 1840, was fiduciary, and that the parties intended to provide additional collateral security for the payment of the mortgage on the infant's estate.

J. The release to Charles R. Whittemore and the receipt from him of $500, in trust, was made in consequence of his holding the lot released by a deed from the special guardian of the complainant. If the mortgage is declared to have been cancelled, the defendant is bound to return the amount.

K. The decree in partition which gave Charles W. Loomer the remainder in fee after the life estate of the widow of Samuel

Loomer v. Wheelwright.

Whittemore, deceased, in the lots on Barrow (and Christopher) street, was erroneous, depriving Otis Loomer of his life estate in said property. The complainant has no present interest in any of the estate mortgaged by his mother, and cannot have, until the death of his father. The mortgage must under any circumstances, be held as a good lien on Otis Loomer's estate, in the property as tenant by the curtesy.

L. If the above views be correct, the decree and sale on foreclosure were valid, and the defendant is only bound to account for the profits of the trust estate. This he has always been ready to do, and the bill having been filed with another object and without the defendants being called on to account, should be dismissed.

M. The decree on foreclosure under which the property was sold, should not be disturbed. It is not alleged that since the decree any new facts have been discovered. All the circumstances connected with the transaction were as fully known to all the parties at the time of filing the bill in foreclosure, and at the time of the decree, as they are now.

THE ASSISTANT VICE-CHANCELLOR.—The bill seeks to set aside as fraudulent, a decree of this court obtained by Mr. Wheelwright against the infant who is now complainant, in February, 1842; by which the lands remaining subject to the mortgage in question, were ordered to be sold, and the equity of redemption of the infant was foreclosed.

That an original bill will lie for this purpose, is too well settled to need a reference to authority.

But it is objected by the defendant, that this bill, if it were all true, does not present a case of fraud in obtaining the decree; and that the matters averred as furnishing proof of fraud, are merely errors of law, for which relief can be obtained by a bill of review only.

If this objection be well taken, it is fatal to the suit. I will therefore examine it in the first instance. So far as it bears upon the point, the case made by the bill is this :

Otis Loomer mortgaged his own lands to Mr. Wheelwright, for his own debt. For a further security, he procured his wife

to join him in mortgaging, for the same debt, her lands which she had by inheritance. The present complainant is the sole heir of Mrs. Loomer. On the 1st of February, 1840, Otis Loomer sold and conveyed to Mr. Wheelwright, the equity of redemption in his own lands mortgaged, for a price exceeding the balance due to Mr. W., for which both mortgages stood as a security. By this means the principal debtor paid the debt with the fund which was primarily liable; and thereby the lands descended to Charles W. Loomer, which were in the place of a surety for that debt, were discharged. That the conveyance to Mr. W. operated as an absolute merger of his mortgage, and in this mode also effected a discharge of the surety. Nevertheless, Mr. W., in November, 1841, filed a bill in this court to foreclose his mortgage on young Loomer's lands, claiming that more than $7000 was due to him, and taking no notice of the other mortgage, or of his dealings with Otis Loomer's lands in February, 1840. That his suit went through the usual course of proceeding in foreclosures, where infants are parties defendant. No special defence was made by the guardian *ad litem*, and a decree was pronounced on the usual formal proofs, on the assumption still maintained by Mr. Wheelwright, that the whole amount claimed by him was due, and a lien on the infant's lands. The guardian *ad litem*, stated nothing of the defence of payment or merger. The decree was enrolled, and all the lots subject to the mortgage, (save one on which Mr. De Peyster held a junior mortgage,) were sold by a master. Mr. W. became the purchaser of two of the lots, and he owns them still. Three other lots were sold to strangers, and the net proceeds were paid to Wheelwright. The facts in regard to the sale made to him by Otis Loomer in February, 1840, came out in January, 1843, in the subsequent contest between W. and De Peyster, relative to the Sixth Avenue lot. The bill charges that the obtaining the decree of foreclosure by Wheelwright, against the infant Loomer, was fraudulent, and deprived the infant of his estate in the lands therein mentioned.

The question is, whether this statement overcomes the bar made by the decree itself, and authorizes this court to look behind it and set it aside.

I do not find that any of the authorities referred to, come up to

the point. The treatises say, "it is said that where an improper decree has been made against an infant without actual fraud, it ought to be impeached by original bill." But I find no adjudication that it may be impeached on the sole ground of its impropriety.

A decree for foreclosure *and sale*, in this state, forms an exception to the general rule that where the infant's inheritance is to be affected by a decree, it must give him a day in court to show cause against its provisions after he becomes of full age. (*Mills* v. *Dennis*, 3 J. C. R. 368; *Harris* v. *Youman*, 1 Hoff. Ch. R. 178; *Wright* v. *Miller*, 1 Sand. Ch. R. 103, 120.)

The decree for a sale, binds the infant, as it does all other parties defendant. Therefore the reported cases, in which infants have been permitted to put in a new answer, and to make a defence, on attaining their majority, do not aid us in this respect.

The omission to give the infant a day to show cause, &c., where by the practice it should be given in a decree, is ground of error on which he may impeach it; but this is distinct from fraud.

Mr. Daniell, in his excellent work on the practice, says that an infant defendant is as much bound by a decree in equity, as a person of full age. And he will not be permitted to dispute an absolute decree made against him, unless upon the same grounds as an adult might have disputed it; such as fraud, collusion or error. (1 Daniell's Ch. Pr. 221, 222.)

I think this case must be governed by the rule as thus laid down. Not that the evidence to support the charge of fraud in obtaining a decree, must be precisely the same in kind or degree, in the instance of an infant defendant; for each case, whether of an infant or an adult, will turn upon its peculiar circumstances; but the decree must be impeached on the same general principles.

I may state, once for all, that in what I shall have to say of the transaction before me, whether as it is stated in the bill, or as it appears by the evidence, I do not use the term *fraud* as imputing any intentional wrong or deceit to Mr. Wheelwright. The law in many instances deduces a fraud, from transactions in which the parties had no dishonest purpose; and the fraud al-

leged here, may well be assigned to that class of constructive frauds.

Without canvassing the debateable ground of fraudulent concealments and suppressions of material facts, I will at once declare my conclusion on the case as made by this bill.

Mr. Wheelwright knew perfectly well, or which is in law equivalent, he was bound to know, that his mortgage was no longer a lien upon the lands of this infant. He might reasonably suppose, as the result proved, that the infant and any guardian *ad litem*, who might be appointed to appear for him in a suit, would remain ignorant that the mortgage was satisfied. It must be assumed that his bill was filed on this hypothesis, because it cannot be presumed that he filed it with the expectation of having it dismissed upon a defence of payment being set up and established. He filed his bill of foreclosure, alleging that there was more than $7000 remaining due to him on his mortgage, when in truth there was nothing due to him. He carried his case through the court, on this false claim, using its forms of proceeding and its officers to establish against an infant, incapable of protecting himself, a state of facts which would divest the infant of his property, and which he knew was wholly unfounded. He withheld in his bill all information in regard to his dealings with the principal debtor and the primary fund, and set forth nothing which would lead the guardian *ad litem*, on whom the court relied for the protection of the infant, to inquire into those dealings, or to suppose that there was such a principal debtor or primary fund. He has thus obtained an enrolled decree against this infant, and unjustly possessed himself of the infant's estate. The question of notice of these facts to the party, in time to make his defence in the former suit, does not arise where such party is an infant.

In the view which I think a court of equity ought to entertain of such a proceeding, this decree was obtained by fraud. I lay great stress upon the fact of the infancy of young Loomer, in weighing these circumstances, because it must be regarded as one of the controlling inducements for filing a bill upon a satisfied mortgage. The case as made by the bill, is between the original parties. No rights of purchasers are called in question ;

and without laying down any general rule for like cases, I feel bound to say that this decree was obtained under such circumstances, that it ought not to be permitted to stand.

So far I have gone upon the allegation s made in the bill, without regard to their truth or falsity. I will next look into the case as it is proved.

The complainant's first position is, that on the execution of the mortgages in 1837, Otis Loomer's property mortgaged, became the primary fund for the payment of the debt, and his wife's inheritance became the secondary or auxiliary fund, for that purpose.

I entertain no doubt of the correctness of this point, and must hold that Mrs. Loomer in respect of her property mortgaged, became the surety for her husband, and that the creditor knew that she was such surety.

It was urged against this conclusion, that the inference from the facts proved is, that the wife intended to make a gift to her husband, or the money was applied for the benefit of her estate.

I cannot assent to this inference. The proof shows that the debt was the husband's, and nearly all of it was due from him to the mortgagees, previous to the execution of the mortgages. He mortgaged his own property in one mortgage, and his wife joined him in another, which conveyed her property. Mr. Wheelwright knew that the debt was the husband's, that the first mortgage was on his property and the other on his wife's estate.

I see no reason why a different rule should be applied to the wife's case, from that which is applied in other instances of principal and surety. If I mortgage my farm to secure my friend's bond debt, and the creditor knows it is my farm, I become a surety for my friend, and the creditor is bound to respect that relationship. The law indulges him in no conjecture that I intend to make a gift to my friend, or that the debt was incurred in some way for the benefit of my property.

Why should such a conjecture or presumption be applied to a wife, in order to disparage her claim as a surety? If there should be any different rule, it ought rather to provide an inference in her favor, than to strain a point against her,

There can be no legal presumption that it is her debt, or was applied for her benefit. She cannot contract a debt; and the presumption on the face of the securities, is therefore directly the reverse as to its being her obligation. And the fact that it is the husband's debt, certainly precludes any presumption ·that it was incurred for the benefit of the wife's estate. The sensible rule, in my view is, that the suretyship is made out by facts like those shown here ; and if in truth the money went to improve the wife's freehold, or any other circumstance exist, which will defeat her claim to be regarded as a surety, it must be proved by the party alleging such circumstance.

Aside from what I conceive to be the true rule of law, the facts in this case do not bring it within Mr. Justice Nelson's observations in *Gahn* v. *Niemcewicz*, (11 Wend. 312, 323.) The defendant sets up nothing of the kind in his answer; there is no proof of any necessity for borrowing to support the wife or to pay assessments, and the giving of two mortgages and the pre-existence of nearly the whole debt, clearly distinguished this suit from the one upon which Judge Nelson was commenting. The point before me was not decided in *Gahn* v, *Niemcewicz*,

Upon the death of Mrs. Loomer, her son succeeded to her rights and became the surety of his father in respect of the property mortgaged by her, The estate of Loomer as tenant by the curtesy, was a primary fund for the payment of the debt, But he had no estate by the curtesy in the lots which in the partition were allotted for the share of Mrs. Loomer, subject to her mother's dower right.

I now come to the conveyance by Otis Loomer, of the Pearl and Cedar street property, in February, 1840. The complainant claims that it must be regarded as a merger of the principal and primary security, or as a payment ; and in either view, it extinguishes the mortgage on his property.

In his answer to the cross bill filed by De Peyster, Wheelwright avows, that the mortgage on the Pearl and Cedar street lots was merged by the conveyance to him of the equity of redemption. His counsel objects to the proceedings in De Peyster's suit, that they cannot be used by one not a party to that suit, to affect the rights of Mr, Wheelwright in another controversy.

This is no doubt true in a qualified sense, but the statements of W. in his answer in that suit, may be used as evidence of facts alleged by him ; and it is in that view sufficient for the complainant's argument in this suit.

Then as to the alleged merger. The deeds were absolute and unqualified, from the mortgagor to the mortgagee. Every intendment upon the deeds is against any idea of keeping the principal mortgage to Wheelwright on foot. All the lands in that mortgage are conveyed in fee simple. The expression in the deeds that they are conveyed subject to the Astor and Salles mortgages, excludes the existence of a design that they were to be subject to any other. In equity, merger depends very much upon intention. Where there is no direct proof of the intention, it may be derived from various circumstances, and one of those is the interest of the party to merge his security, or to keep it alive. But that is only one circumstance, and it may be repelled by others. The party may intend to merge, upon a mistaken view of his interest. He may judge erroneously when he knows all the facts ; and he may err exceedingly in regard to the law° as applicable to what he is doing. But I am not aware of any principle upon which he can be saved from the consequences of a merger, where his intent is clear, although by a mistake of the law, he supposes he will obtain advantages, which the law correctly applied, entirely cuts off.

I have no doubt but that this is precisely such a case ; and that Mr. Wheelwright, although he intended to merge and put an end to the mortgage on the lots in Pearl and Cedar streets; equally intended to enforce the mortgage debt upon the lands embraced in the other mortgage, and supposed that the law would bear him out in that proceeding.

The instrument upon which he now relies to rebut the merger, leaves no room for doubt, that both he and Loomer then intended to extinguish the mortgage on the lots conveyed. It contemplates no further recourse to it, or any event upon which it may be brought to bear. It declares an absolute purchase at $116,350, and provides for applying any surplus beyond that, gained by W. in the purchase, to Loomer's debt, which as I before remarked, W. intended to hold against the other lands.

The allegation in his answer to the bill of De Peyster, is legit-
imate evidence of his intention to merge the mortgage, although
not conclusive upon him in this suit as matter of law.

The instrument which Mr. Wheelwright executed to Loomer,
cannot overcome the effect of the conveyances. It was not de-
signed to make them a new mortgage. That would have been
a very idle proceeding. I speak of it as if it had been cotemporary
with the conveyances. But it was not executed until after the
deeds were delivered, and the character of the transaction in re-
spect of the rights of the surety, irrevocably fixed.

The existence of the alleged subsequent liens, does not impair
the evidence of intention. For the principal lien, that to W. T.
Whittemore, Mr. W. provided out of the purchase money, and
the others, if as it is said, they were unknown to him, could
not have influenced his objects or designs in the purchase.

It also objected to the merger, that the interest of Spofford and
Tileston in the mortgage, was still outstanding, and prevented
any merger of the legal and equitable estates. There are two
answers to this objection. First, it is shown that the arrange-
ment by which Spofford and Tileston were fully paid, was made
in 1839, and was merely awaiting the order of this court for its
consummation. So that Mr. W. acted, as he well might, upon
the assumption that their interest had ceased, and when the con-
veyance was finally made to them, its equitable effect was the
same as if it had been made when agreed upon in 1839. And
second, the interest of S. and T. was wholly distinct from that of
Mr. W. ; as distinct as if it had been in a separate mortgage.
Therefore Mr. W. might so act, as to merge the mortgage as it
respected his own interest, without any reference to that of the
other mortgagees; and when the latter were at length paid, the
security would then be finally extinguished as to all the mort-
gagees.

My conclusion therefore is, that by accepting the conveyance
in fee of the principal fund mortgaged to him, Mr. W. discharged
the lands of the surety from his mortgage debt.

There is another view of this transaction which is equally fatal
to Mr. W.'s claim against the estate of the infant. He purchased
the equity of redemption of the principal debtor, and thereby

precluded himself from enforcing the mortgage against the primary fund.   The least that can result to him is, that he must account as between himself and the surety, for the value of the equity of redemption, and he has fixed that value by the price which he paid for it.  · I know it was urged that this price was merely nominal, and the lands were not worth the prior incumbrances.   But the deeds, and the memorandum of the application of the purchase money which Mr. W. made at the time, show beyond peradventure, that the price agreed upon was $8350, over and above the mortgages to Astor, and the executors of Salles ; and that this surplus was actually appropriated and paid as between the immediate parties.   Such also is the positive declaration of the agreement which Mr. W. gave to Loomer after the sale ; and the profits which he thereby proposed to apply to the debt of Loomer, were to be computed on the cost of $116,350 paid for the Pearl and Cedar street lots.

From this price, $8350, exclusive of the large mortgages, Mr. W. is entitled to deduct the taxes then in arrear.   He is not to deduct the arrears of interest on those mortgages ; for the deeds are subject to the amount due on the mortgages, both principal and interest ; and the memorandum before mentioned shows that this was the intention.

After deducting the taxes, $514 45, there remains $7835 55, which Mr. W. must account for before calling on the surety ; and this is confessedly more than was then due to him on the mortgage in question.

It follows that this mortgage was extinguished, so far as Mr. Wheelwright's interest was concerned, in February, 1840, as a lien upon the lands of the infant.   It is however claimed in his behalf, that he has a lien by virtue of the mortgage, for the $675 which he advanced to Spofford and Tileston on their finally releasing their portion of the mortgage ; on the ground that it was originally given to secure future advances.   The complainant's counsel contends that it never was good for future advances, because it does not in terms provide for them.

I will not enter into that discussion, but will assume that the mortgage was valid for that purpose.   It was not valid to Mr.

W. for that or any other purpose, against this infant, after February, 1840. It was merged, extinguished, gone.

It was not insisted that the advance was any more a lien in favor of Mr. W., because it was made to his co-mortgagees. Nevertheless, I was at first inclined to think that Mr. W. might avail himself of it, not as an advance on his own mortgage, but by way of subrogation to the lien of Spofford and Tileston. But upon consideration, I cannot give to it that advantage. It was paid to S. and T., distinctly and avowedly for the purpose of discharging their lien; and there was no mistake or misapprehension as to a single fact by any of the parties. The only error was one of law, which was Mr. W.'s idea that his own lien was still in full force. I must therefore give to the transaction the direction that the parties then gave to it, and deem Spofford and Tileston's mortgage interest fully discharged. (See *Banta* v. *Garmo*, 1 Sand. Ch. R. 383.) There is no mode by which the payment of the $675 can be continued as a lien against the complainant's lands.

The complainant has therefore established the case made by his bill, and the decree which the defendant obtained in his foreclosure suit, must be set aside so far as it respects his rights and claims under the same.

There are a few other matters which require attention before disposing of the subject.

One of these is the claim made by the complainant for $500, paid to Mr. Wheelwright by Charles R. Whittemore. This affair is left in great obscurity by the testimony. So far as I can discover, the money was paid to Mr. Wheelwright, not because the infant was entitled to receive it from C. R. W., but because C. R. W. could not otherwise obtain a release from the mortgage in question. If there had been no mortgage, no money would have been paid by C. R. W.; and as between him and the infant the latter was bound to pay the mortgage, so as to entitle C. R. W. to a return of the money. It appears to be a matter between C. R. W. and Mr. Wheelwright, in which the infant, in this suit at least, has no concern. How his title in the lot came to be conveyed to C. R. W. is not shown, and I can found no judgment upon that transaction.

The defendant insists that Otis Loomer had an estate by the curtesy in all these lands, upon which the mortgage continued operative, and the foreclosure and sale are valid to that extent.

I have already observed that Loomer had no estate in the lots which were assigned to Mrs. Jane Whittemore for her dower. In the other lots which fell to Charles W. Loomer in the Whittemore partition, Otis Loomer had a life estate. Upon this life interest, Mr. Wheelwright's mortgage continued to be a lien. There was no merger as to O. Loomer, because he agreed expressly, by accepting the writing dated February 6th, 1840, that the mortgage on these lands should remain in full force. As to him and his estate, it therefore continued valid for the whole amount due to Mr. W. in February, 1840, less that part of the $8350 on the sale of the Pearl and Cedar street lots which was saved from the estimated amount of W. T. Whittemore's mort- gage. And the subsequent payment of $675 to Spofford and Tileston, ought to be compensated to Mr. W. by Loomer in the adjustment of the application of the purchase money of the lots in Pearl and Cedar streets.

But another equity of the infant intervenes, which renders this right of Mr. W. against Loomer, practically of little or no value to the former. As these securities stood in 1839, when Spofford and Tileston agreed to receive the conveyance of two of the infant's lots, and discharge their lien under the mortgages, the infant had a right to be subrogated to their lien against his father's lands, to the extent of the value of his interest in those two lots, on their being applied to the payment of his father's debt. (*Eddy* v. *Traver,* 6 Paige, 521.) This right of subroga- tion extended to his father's life estate as tenant by the curtesy, as well as to his lots on Pearl and Cedar streets. As between Mr. W. and the infant, the mortgage debt of W. was paid off by his purchase in February, 1840; so that he has no right to in- terpose his debt to the prejudice of the infant's subrogation for the amount which his property has paid to Spofford and Tileston. For this amount therefore, the infant's equity under the mort- gage in question, must be preferred to Mr. Wheelwright's claim as between himself and Otis Loomer on the tenancy by the curtesy.

In this connection however, I think that it is but just for the infant to account for the $675, paid by Mr. W. to Spofford and Tileston. Unless that payment had been made, S. and T. would still have held their lien for that sum, with priority over the infant's claim to be subrogated. And seeking equity, he must here do equity in regard to this direct relief which Mr. W.'s payment has afforded to his property.

The payment made by Mr. W. to Mr. Astor in discharge of the original mortgage on the Christopher street lot, is a proper charge by him against the infant in the account to be taken.

The other transactions between Mr. W. and Otis Loomer, ostensibly for the benefit of the infant, and I doubt not, really intended for his benefit, are not subjects to be brought into this suit.

No one was legally authorized to act in them for the infant, and he is not liable in respect of them. They are entirely foreign to the matters upon which the infant's rights in this controversy depend ; and other persons must be made parties to any proceeding by Mr. W. founded upon those transactions.

There must be a decree accordingly. Mr. W. must release and convey to the infant the two lots which he purchased at the Master's sale, and must account for the sums paid by those who bought the other lots sold by the Master under Mr. W.'s decree, with interest thereon. If he so elect, he may have an account taken of the value of Otis Loomer's life estate in those lots in which he was tenant by the curtesy, estimating those sold to strangers at the prices then obtained, and the Christopher street lot at its present value ; and against this valuation of Loomer's estate in the lands, there must be placed the amount which the infant's property has paid to Spofford and Tileston, with interest thereon. The $675, paid by W. to the latter, is a proper item on his side of this account.

If the value of Loomer's life estate, and the $675, exceed the amount for which the infant is entitled to be subrogated under Spofford and Tileston, the excess is to be credited to Mr. W. in the general accounting.

He is also to account for the rents and profits of the two lots

which he bought at the master's sale. And he is to be credited in the account for the sum paid to Mr. Astor, with interest on the same.

If the balance be found in favor of Mr. Wheelwright, he will have a lien for the amount on the two lots which he is to convey to the infant. If it be against him, he must pay it into court for the infant's benefit. And he must bear the costs of this suit,